The Honorable Barbara J. Rothstein

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

5450 SANDPOINT WAY N.E., LLC,

    Plaintiff,

v.

EXXONMOBIL OIL CORPORATION,

    Defendant.

Case No. 23-cv-01244-BJR

**MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## I.      INTRODUCTION

This matter came on for trial before the Court, sitting without a jury, from December 8 through 11, 2025. Plaintiff 5450 Sandpoint Way N.E., LLC ("Plaintiff") was represented by Douglas Steding and Merryn DeBenedetti, and Defendant ExxonMobil Oil Corporation ("Exxon") was represented by James Bulthuis. The Court took the matter under advisement at the conclusion of trial.

In a bench trial, the court serves as the trier of fact and is responsible for resolving conflicts in the evidence, assessing witness credibility, and drawing reasonable inferences from the record. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 573–75 (1985) (explaining that findings based on credibility determinations are entitled to particular deference); *Pullman-Standard v. Swint*, 456

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 1

U.S. 273, 287–88 (1982) (holding that factual findings are reviewed for clear error under Rule 52(a)). Plaintiff bears the burden of proving its claims by a preponderance of the evidence. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 387 (1983). Having considered the testimony, admitted exhibits, demonstrative materials, the parties' stipulated facts to the extent supported by the record, the arguments of counsel, the parties' proposed findings and conclusions, and the applicable law, the Court rules as follows pursuant to Federal Rule of Civil Procedure 52(a).

## II.    FACTUAL FINDINGS

### A.    Plaintiff's Claims

Plaintiff is a Washington limited liability corporation with its principal place of business in Seattle, Washington and is the current owner of a gasoline service station located at 5450 Sand Point Way N.E. in Seattle, Washington ("the Property"). Plaintiff brings this private action against Exxon under Washington's Model Toxics Control Act ("MTCA"), Wash. Rev. Code § 70A.305 *et. seq.*, and the federal Declaratory Judgment Act, 28 U.S.C. § 2201, relating to petroleum contamination on the Property. Dkt. No. 1 at ¶ 1. Plaintiff claims $332,632.61 in past remedial action costs and seeks to recover a significant portion of those costs from Exxon. In addition, Plaintiff requests that the Court declare Exxon liable for future remedial action costs necessary to remove the contamination from the Property. Lastly, Plaintiff requests that the Court declare it the "prevailing party" under RCW 70A.305.080 and award reasonable attorneys' fees and expenses.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 2

**B.    The Property**

**1.    Description[1]**

The Property is an irregularly shaped parcel of land that is approximately 13,330 square feet. It slopes generally to the east and south, with an elevation change of approximately five feet. Petroleum fueling services have been provided on the Property since approximately 1926. Currently on the Property is a gas service station with a retail store and two pump islands beneath a canopy with four fuel dispensers. Until 2023, the station also included a full-service garage with three service bays. In 2023, that portion of the building was remodeled to expand the retail store. Surrounding land uses include commercial and residential properties, including apartment buildings to the east and southeast.

Three 10,000-gallon underground storage tanks are located southwest of the pump islands. Two sets of product lines run from the tanks to the pump islands. A 550-gallon waste oil underground storage tank was previously located adjacent to the service bay and was decommissioned in 2023.

**2.    Ownership**

The service station was constructed on the Property in 1926 and has operated continuously at that location since that time. Stip. Facts ¶ 14. From 1928 to 1982, Exxon's predecessors leased the facilities to various operators. *Id*. ¶ 15. On or about December 30, 1982, Exxon's predecessor, Mobil Oil Corporation, sold the Property to Gerald and Patricia Baldwin. *Id*. ¶ 11. The Baldwins subsequently sold the Property to Jeff and Jennifer Gietzen pursuant to an Asset Purchase Agreement dated January 27, 2004. *Id*. ¶ 12; Ex. J8. In February 2021, the Gietzens transferred the

---

[1] The Property description comes from Stip. Facts, ¶ 14; Defendant's Exhibit ("Ex. D") 105 at pp. 8 and 48; Plaintiff's Exhibit ("Ex. P") 133 at p. 6; Ex. P135 at 2.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 3

Property to 5450 Sandpoint Way N.E., LLC. *Id*. ¶ 13. Jeff Gietzen is the managing member and handles the day to day operations of the corporation.

### 3.    Underground Storage Tanks

A 550-gallon underground storage tank used to store gasoline was installed on the Property in or around 1926. Stip. Facts ¶ 14. The service station was remodeled in 1947, at which time two 1,000-gallon underground storage tanks, two fuel pumps, and a new shop were added. *Id*. ¶ 16. Between 1957 and 1958, three additional underground storage tanks were installed: a 6,000-gallon tank, a 4,000-gallon tank, and a tank of unknown capacity. *Id*. ¶ 17. In 1964, three new steel underground storage tanks and one underground storage tank for waste oil were installed. *Id*.

In 1987, the four tanks installed in 1964 were replaced with three single-walled, steel-coated 10,000-gallon tanks and one waste oil tank. *Id*. ¶ 19. These tanks are located in the northwest quadrant of the Property, in the same general location as the 1964 tanks, and remain in use today, more than three decades after installation.

### C.    Contamination on the Property

The parties agree that the following contaminants have been found in the soil and groundwater on the Property: gasoline-range total petroleum hydrocarbons, benzene, toluene, ethylbenzene and xylene, naphthalene, ethylene dichloride, and light non-aqueous phase liquid. *Id*. ¶¶ 23-25.

### a.    History of Contamination

As stated above, Exxon's predecessors sold the Property to the Baldwins in 1982. *Id*. at ¶ 11. The record contains no evidence that Exxon's predecessors were aware of any contamination on the Property at the time of that sale. Dkt. Nos. 56-59, Trial Transcript ("TR"), at 438-439.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 4

### i. Baldwin retains WGR Southwest, Inc. to assess potential contamination on the Property

In 2001, Gerald Baldwin sought to sell the Property and retained WGR Southwest, Inc. ("WGR"), an environmental consulting firm, to assess the Property for the potential presence of petroleum hydrocarbon releases. Ex. D105 at 6. In November 2001, WGR collected soil samples from 16 locations and analyzed them for petroleum contamination. *Id*. The results confirmed the presence of petroleum hydrocarbon compounds in the vicinity of the underground storage tanks and pump islands. *Id*. at 11. The affected area appeared to cover at least 1,200 square feet, although the investigation did not fully delineate the vertical or lateral extent of contamination. *Id*.

On December 10, 2001, WGR notified the Washington State Department of Ecology ("Ecology") of a petroleum release at the Property. Ex. D42 at 15; Ex. D105 at 111. Ecology's internal records reflect that WGR attributed the release to a leaking underground storage tank. Ex. D105 at 111, 114–17. WGR subsequently prepared a Phase II Assessment Report based on its November 2001 investigation. *Id*. at 6–45. The report is dated January 4, 2002 and was provided to both Baldwin and Ecology.

### ii. The 2008 Letter from Ecology to Gietzen

Six years later, on July 31, 2008, Ecology sent a letter to Jeff Gietzen, who then owned the Property, inquiring about the status of the petroleum contamination. *Id*. at 4. The letter stated that WGR's January 2002 Phase II Assessment Report was the most recent information Ecology had received regarding the release and requested an update on the status of any cleanup efforts. Ecology directed Gietzen to provide a written response by August 14, 2008. The record contains no evidence that Gietzen responded to this request.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 5

### iii.    GeoScience Management, Inc. installs a groundwater monitoring well on the Property in 2012

In January 2012, Gietzen retained GeoScience Management, Inc. ("GSM"), an environmental consulting firm, to develop investigation and cleanup goals for the Property in connection with potential entry into Ecology's Voluntary Cleanup Program. Ex. D105 at 47–48. GSM installed a groundwater monitoring well ("MW-1") near the downgradient edge of the Property to assess the presence of gasoline-range hydrocarbons. *Id*. at 48. The well extends to a depth of approximately 45 feet, with groundwater encountered at approximately 39 feet. *Id*. Soil samples were collected at approximately five-foot intervals during drilling. Two soil samples— collected at depths of five and thirty-five feet—and a groundwater sample were analyzed and were below applicable MTCA cleanup levels. *Id*.

Based on these results, GSM concluded that groundwater impacts were not migrating off-site toward the nearest downgradient property. *Id*. at 49. The record does not reflect that GSM's report was submitted to Ecology at that time.

### iv.    The 2013 violation notice and 2016 leak

On February 6, 2013, Ecology issued a notice of violation to Gietzen concerning corrosion, overfill protection, and leak detection deficiencies associated with the Property's underground storage tanks. Ex. D105 at 1. The record reflects no further action regarding this violation until February 2016, when Gietzen replaced the gas pump dispensers to address the noncompliance issues identified by Ecology in 2013. Ex. D105 at 1; Tr. 61. During that work, a contractor detected a gasoline odor and identified a leak in one of the pipes connecting the dispensers. Tr. 61–62, 88; Ex. D105 at 88–89, 101. As a result, approximately one ton of contaminated soil was excavated and disposed of from the area surrounding the pump island. Ex. D105 at 89; Ex. P133 at 10. Despite

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 6

this removal, Gietzen testified that contamination remained in the soil around the pump dispensers. Tr. 90.

### v. Gietzen seeks to enroll the Property in Ecology's Voluntary Cleanup Program

In April 2016, Gietzen retained DLH Environmental Consulting ("DLH"), an environmental consulting firm, to respond to Ecology's July 31, 2008 inquiry regarding the status of cleanup at the Property and to address the 2013 notice of violation. Ex. D105 at 1. That same month, DLH re-sampled groundwater from monitoring well MW-1, which had been installed by GSM in 2012. *Id*. The results confirmed the absence of detectable hydrocarbons in groundwater. *Id*. DLH nevertheless concluded that impacted soils likely remained in the vicinity of the pump islands and suggested that such contamination would be addressed in the future if the existing underground storage tanks, installed in 1987, were removed. *Id*. at 2.

On July 16, 2016, DLH, on behalf of Gietzen, submitted a request to enroll the Property in Ecology's Voluntary Cleanup Program. *Id*. at 1. The submission included the prior reports prepared by WGR and GSM, documentation relating to the pump dispenser upgrades, and DLH's groundwater testing results. *Id*. DLH also submitted a Voluntary Cleanup Program application completed by Gietzen. Ex. D42.

In that application, Gietzen reported releases of benzene, toluene, ethylbenzene, xylene, gasoline, and lead at the Property and identified the source as a leaking pump or pipe in the pump island. *Id*. at 7–8, 12. He stated that the release resulted in soil contamination and was initially identified during a Phase II assessment conducted in connection with a potential sale of the

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 7

Property. [2] *Id*. at 7–8. Gietzen further represented that remedial actions undertaken to date included a completed "Initial Response" [3] and "Interim Action," and an ongoing "Remedial Investigation." *Id*. at 15. Although he indicated that a "Cleanup Action" was planned, he also stated that he did not intend to further characterize or actively remediate the contamination at that time, but instead planned to monitor potential impacts to groundwater using existing monitoring wells. *Id*. at 13, 15. He further indicated that any contaminated soil would be addressed in the future if and when the underground storage tanks were removed. *Id*. Finally, Gietzen requested that Ecology provide a written opinion regarding the adequacy of the actions taken to date. *Id*. at 3.

**vi.        The 2017 Ecology advisory opinion**

On September 20, 2017, Ecology issued the requested advisory opinion. Ex. D44. Ecology concluded that Gietzen's proposed plan to monitor soil contamination through periodic sampling of a single groundwater monitoring well was insufficient under MTCA and its implementing regulations. *Id*. at 2. Ecology further advised that the Property would not remain in the Voluntary Cleanup Program unless Gietzen notified Ecology within 30 days of the additional remedial actions planned for the site. *Id*.

Ecology also explained that, before determining appropriate cleanup standards or evaluating the adequacy of any remedial actions, a complete site characterization is required, including delineation of the full extent of contamination. *Id*. After reviewing DLH's submissions, Ecology identified several data gaps that prevented proper characterization of the site: (1) the lateral and vertical extent of contamination near the pump islands and underground storage tanks had not been

---

[2] While Gietzen does not provide a date for the release in the application, it is clear from the context that he is referring to the contamination that was discovered by WGR in 2001 when it was retained by Baldwin.

[3] It appears that, here, Gietzen is referring to the nearly one ton of dirt that was removed from near the pump island after the leaking dispenser was discovered by the contractor in 2016.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 8

delineated; (2) soil samples had not been analyzed in accordance with applicable MTCA requirements; and (3) the available data were insufficient to determine whether groundwater had been impacted. [4] *Id*. at 2–3.

### vii.   Ecology removes the Property from the Voluntary Cleanup Program in 2017

Gietzen failed to respond to the advisory opinion so on August 15, 2018, Ecology notified him that the Property had been removed from the Voluntary Cleanup Program. Ex. D45.

### viii.   The 2020 leak

Gietzen took no further action with respect to the contamination on the Property until April 1, 2020, when a required annual inspection identified a leak at the turbine head of the premium gasoline underground storage tank. Ex. D46 at 3; Ex. D80 at 2. The inspector determined that the turbine head was loose, tightened it, and the leaking ceased. Ex. D46 at 3, 11. The record does not establish how long the turbine head had been leaking. However, the same turbine pump was noted to be "weeping" during a January 2017 inspection. Ex. D43 at 2; Ex. P132 at 1 (noting visual and olfactory evidence of petroleum contamination in the tank nest of the premium gasoline underground storage tank).

The release was reported to Ecology. On April 7, 2020, Gietzen submitted a claim to Plaintiff's insurer, Colony Insurance Company ("Colony"). Tr. 64; Ex. D49; Ex. P139. Colony agreed to investigate, defend, and indemnify Plaintiff under a reservation of rights. Ex. P139 at 1.[5]

---

[4] Specifically, Ecology advised that "a minimum of three ground water monitoring wells are needed" to determine the direction of groundwater. Ex. D44 at p. 3

[5] As of January 28, 2025, Colony has incurred $464,411.46 in corrective action costs on behalf of Plaintiff. Ex. P139 at ¶ D. These costs include the investigation of the nature and extend of the release petroleum that occurred in April 2020, in addition to the investigation into the nature and extend of historic releases of petroleum on the Property, as well as remediation. *Id*. Colony has apportioned $328,980.95 of those costs to the site investigation and $135,430.51 of the costs to remediation associated with the April 2020 release. *Id*. In April 2025, Plaintiff entered an Authorization Agreement with Colony, assigning Colony's rights against Exxon to Plaintiff to pursue. *Id*. at p. 2. The amount which

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 9

> ix.    **Gietzen retains Aspect Consulting to prepare a site assessment report and checklist in response to the 2020 leak**

Thereafter, Gietzen retained Aspect Consulting, LLC ("Aspect") to prepare a Site Assessment Report and Checklist in accordance with Ecology's investigation requirements. Ex. P132 at 1. On April 22, 2020, Aspect advanced six soil borings (designated AP-1 through AP-6) to depths ranging from approximately five to twenty feet and collected one soil sample from each boring. *Id*. at 2. The borings were located generally downgradient and cross-gradient from the premium gasoline underground storage tank nest. *Id*. Aspect also collected a groundwater sample from monitoring well MW-1, which had been installed by GSM in 2012. *Id*.

Laboratory analysis showed that all soil samples exceeded applicable MTCA cleanup levels, while the groundwater sample did not. *Id*. Based on these results, Aspect concluded that the data suggested a recent release associated with the turbine head at the premium gasoline underground storage tank and noted that prior releases had been documented at the site. *Id*. at 3. Aspect recommended that a remedial investigation be conducted to delineate the vertical and horizontal extent of contamination, install additional monitoring wells to assess groundwater conditions, and evaluate potential soil vapor impacts. *Id*.

Aspect submitted its Site Assessment Report to Ecology on August 27, 2020. *Id*. at 2. No further work was performed by Aspect until March 2021, when it resumed its investigation in order to prepare a remedial investigation work plan. Ex. D51; Tr. 183–84; Ex. P133.

---

Plaintiff recovers from Exxon will be repaid to Colony, who will in turn add the recovered amount to its remaining policy limits to fund future cleanup of the Property. Tr. 78-79.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 10

**x.      Aspect's April 16, 2021 Remedial Investigation Work Plan**

Based on data collected in April 2020 and March 2021, Aspect prepared a Remedial Investigation Work Plan dated April 16, 2021 ("the RIWP"). Ex. P133. The stated purpose of the RIWP was to collect additional information and evaluate data gaps in order to characterize the nature and extent of potential contamination at the site. *Id*. at 6. The RIWP identified several data gaps, including: (1) the existence and location of former underground storage tanks; (2) the lateral and vertical extent of known soil contamination near the current underground storage tanks; (3) potential releases associated with former and current waste oil underground storage tanks; (4) groundwater quality and flow direction; and (5) the potential impact of contamination on adjacent properties and groundwater. *Id*. at 12.

To address these data gaps, the RIWP proposed additional investigation activities, including: (1) a sitewide ground-penetrating radar survey to identify subsurface features; (2) installation of up to ten soil borings to characterize soil contamination; (3) collection of soil samples at approximately 2.5-foot intervals to a depth extending approximately five feet below the water table (or deeper, if warranted); (4) laboratory analysis of selected samples; (5) conversion of up to four borings into groundwater monitoring wells, based on anticipated groundwater flow; (6) groundwater sampling and analysis; and (7) a preliminary evaluation of the soil vapor pathway. *Id*. at 13–16.

Aspect began implementing these investigation activities in July 2021.[6] Ex. P134. Eight soil borings were advanced to depths ranging from approximately 31.5 to 46.5 feet (designated AB-1,

---

[6] Unfortunately, during this work, a drill rig broke an underground fuel line causing gasoline to release into the surrounding soil. Tr. 91-94. While Gietzen believes that Aspect properly cleaned up the contamination from the fuel line strike, he has not released Aspect from liability for the incident. *Id*. at 94.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 11

AB-2, AB-3, AB-6, and MW-2),[7] and soil samples were collected at intervals of approximately 2.5 to 5 feet to depths extending below the water table. *Id*. at 6–7. Four borings were converted into groundwater monitoring wells (MW-2 through MW-5). *Id*. at 9. Data from these wells indicated that groundwater is present at depths ranging from approximately 24.64 to 35.89 feet and flows generally to the east and southeast, away from the underground storage tanks. *Id*. at 10. Groundwater samples were collected from MW-2 through MW-4 and submitted for laboratory analysis. *Id*. at 9–10. No groundwater sample was collected from MW-5 because the well contained more than one foot of light non-aqueous phase liquid ("LNAPL"). *Id*. at 10–11.

Laboratory results showed that multiple soil samples contained petroleum hydrocarbons at concentrations exceeding MTCA cleanup levels, including samples from AB-1, AB-4 through AB-6, MW-2 through MW-3, and MW-5 through MW-6. *Id*. at 8. BTEX and naphthalene compounds were detected in all soil samples. *Id*. Groundwater samples from MW-2 and MW-3 also exceeded MTCA cleanup levels for petroleum constituents. *Id*. at 10–11.

In addition, ethylene dichloride ("EDC") was detected in soil and groundwater samples from AB-1, AB-2, and MW-2. *Id*. at 8–9, 11. EDC is a fuel additive historically used in leaded gasoline to remove lead deposits from engine combustion chambers. Federal regulation of leaded gasoline began in 1973, and the sale of leaded gasoline for on-road motor vehicles was banned effective December 31, 1995. Stip. Fact ¶ 22. Because EDC was used only in leaded gasoline, its presence in the samples indicates that at least some of the petroleum contamination at the Property is attributable to releases that predate 1996 (*i.e.*, predate Gietzen's purchase of the Property). *See* Ex. P134 at 9.

---

[7] Soil borings AB-4 and AB-5 could not be advanced as proposed in the RIWP due to obstructions. Ex. P134 at 6.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 12

### xi.    Aspect's December 2021 Remedial Investigation Work Plan Addendum

Based on the foregoing soil and groundwater sampling results, Aspect prepared a Remedial Investigation Work Plan Addendum dated December 2021 ("the RIWP Addendum"). Ex. P135. The stated purpose of the RIWP Addendum was to summarize the results of the remedial investigation to date, evaluate remaining data gaps, and recommend additional investigation necessary to meet MTCA's objective of characterizing the nature and extent of contamination at the site. *Id*. at 5. The RIWP Addendum identified the following potential contaminant concerns: (1) gasoline-range total petroleum hydrocarbons in soil and groundwater; (2) BTEX and naphthalene in soil and groundwater; and (3) EDC in groundwater. *Id*. at 12–13. It further identified remaining data gaps, including: (1) the lateral extent of soil and groundwater impacts;[8] (2) delineation of the LNAPL accumulation and evaluation of recovery options; and (3) the potential for migration and intrusion of petroleum vapors into the on-site building. *Id*.

To address these data gaps, the RIWP Addendum recommended additional remedial investigation activities, including: (1) installation of five new off-property monitoring wells to facilitate additional soil and groundwater sampling; (2) testing to determine the composition, source, and timing of the LNAPL release; and (3) installation of two sub-slab soil gas sampling pins to evaluate soil vapor conditions. *Id*. at 14–18.

The detection of EDC at the site marked a shift in the focus of Aspect's investigation. Tr. 197. In addition to delineating the extent of contamination, Aspect began evaluating whether some of the contamination resulted from releases predating the 2020 release for which it had originally

---

[8] The RIWP Addendum concludes that vertical zone of soil contamination on the Property appears to be limited to the upper 45 feet of the subsurface. Ex. P134 at p. 19.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 13

been retained. *Id*. Around this time, Gietzen retained legal counsel, and Aspect began consulting with that counsel. Tr. 145; Ex. D66 at 2; Ex. D68 at 1. Gietzen also retained Exponent, a consulting firm specializing in environmental liability, which provided input to Aspect regarding investigative work aimed at determining whether releases had occurred prior to Gietzen's ownership. Ex. D70; Ex. P150; Tr. 200–02.

Aspect thereafter conducted additional soil and groundwater investigations. Exs. D68, D70; Ex. P135. Five additional soil borings (designated AB-7 through AB-10) were advanced to depths ranging from approximately 30 to 47 feet, and soil samples were collected. Ex. P135 at 8. One of these borings was converted into a groundwater monitoring well ("MW-6"). *Id*. Additional groundwater samples were collected from MW-1 through MW-4 in March, June, September, and December 2022. *Id*. at 14. Groundwater samples were not collected from MW-5 in March, June, or September 2022 due to the presence of LNAPL, although a sample was collected in December 2022. *Id*. at 17. No groundwater sample was collected from MW-6 because LNAPL was present in that well. *Id*. at 13–14, 17. Two additional rounds of sub-slab soil gas sampling were conducted in March and September 2022. *Id*. at 14.

Laboratory results showed that multiple soil samples—including those from AB-7, AB-9 through AB-10, MW-1 through MW-3, and MW-5 through MW-6—contained petroleum hydrocarbons at concentrations exceeding MTCA cleanup levels. *Id*. at 16. BTEX or naphthalene compounds were detected in all soil samples. *Id*. EDC was detected in samples from AB-1, AB-2, AB-7, AB-8, and MW-2, and tetraethyl lead was detected in samples from AB-9 and AB-10. *Id*. at 16–17. Groundwater samples from MW-2, MW-3, and MW-5 also exceeded MTCA cleanup levels for petroleum constituents. *Id*. at 18. BTEX was detected in MW-1, MW-2, and MW-5, and EDC

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 14

was detected in MW-2. *Id*. LNAPL was removed from MW-5 and MW-6 in March and November 2022, respectively, and regular LNAPL recovery events began in March 2023. *Id*. at 14–15.

Aspect noted that the presence of EDC and tetraethyl lead in the samples indicates that at least a portion of the contamination at the site is attributable to releases that occurred prior to 1996. *Id*. at 17, 22.

**xii.    Aspect's July 28, 2023 Remedial Investigation Update**

After completing the additional investigation, Aspect issued a Remedial Investigation Update dated July 28, 2023 ("the RI Update"). Ex. P135. The RI Update summarizes the remedial investigation activities conducted to date, presents a conceptual site model based on the resulting data, and provides recommendations for the next phase of the investigation.[9] *Id*. at 5, 26. The RI Update identifies gasoline-range total petroleum hydrocarbons, BTEX, naphthalene, and EDC as contaminants of concern at the site. *Id*.

The RI Update states that the vertical extent of soil contamination exceeding MTCA cleanup levels extends to approximately 45 feet below ground surface, while the lateral extent of impacted soil remains undelineated. *Id*. at 20–21, 26. It further states that groundwater flows to the east and southeast; as a result, the extent of groundwater contamination exceeding MTCA cleanup levels is delineated to the north and west of the Property but remains undefined to the south and east.[10] *Id*.

The RI Update recommends the following actions for the next phase of the remedial investigation:

---

[9] A conceptual site model prepared in accordance with MTCA is a structured explanation of how contamination exists and behaves at a site.

[10] Groundwater samples from MW-1 and MW-4, located in the northern and western sections of the Property, did not contain contaminates that exceeded MTCA cleanup levels. Ex. P135 at p. 18.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 15

- Ongoing recovery and removal of LNAPL from MW-5 and MW-6 to minimize migration;[11]
- Semi-annual groundwater sampling at MW-1 through MW-4 to monitor plume stability; and
- Off-site investigation to delineate the lateral extent of soil and groundwater impacts.

*Id*. at 26–27.

### D.    The Remedial Investigation Remains Incomplete

The remedial investigation of contamination at the Property is not complete. Tr. 182. Witnesses for both parties agree that additional investigation is necessary to determine the lateral extent of the contamination. Tr.166-167, 573-575. Although Aspect recommended in July 2023 that off-site investigation be conducted to delineate the lateral extent of soil and groundwater contamination, that work has not been performed. As a result, no feasibility study has been completed, and Plaintiff has not developed or submitted to Ecology a plan for remediation. The record further reflects that Plaintiff has not engaged with Ecology regarding the remedial investigation conducted to date (other than providing Aspect's Site Assessment Report to Ecology on August 27, 2020) and has not obtained agency feedback concerning additional investigation or cleanup requirements.

In May 2025, Gietzen enrolled the Property in the Technical Assistance Program administered by the Washington State Pollution Liability Insurance Agency ("PLIA"). Ex. P140. As a condition of continued participation, PLIA requires that the remedial investigation be completed by May 14, 2026. Ex. P141.

---

[11] Although the RIWP Addendum recommended that the LNAPL be tested to determine its composition, the RI Update did not recommend such testing. Compare Ex. P134 at p. 11 to Ex. P135 at p. 26.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 16

**E.    The Experts' Opinions**

**1.    Dr. Kirk O' Reilly and Mr. Edward Healey**

Plaintiff's expert Dr. Kirk O'Reilly and Exxon's expert Mr. Edward Healey offer competing opinions regarding the timing, source, and significance of the petroleum contamination on the Property, but their testimony does reflect several important areas of agreement. Both experts agree on the historical development of the infrastructure on the Property, including the presence of multiple generations of underground storage tanks and the general evolution of the pump and tank locations over time. They also agree that petroleum was released on the Property prior to 1982, during Exxon's period of ownership. Tr. 601, 625. They further agree that older forms of gasoline, including "straight-run" gasoline, were delivered to and stored on the Property during Exxon's ownership, and that gasoline became more complex over time. Tr. 262, 272-273, 284-286, 631. Lastly, they both agree that additional remedial investigation is necessary to fully characterize the nature and extent of contamination on the Property.

Dr. O'Reilly and Mr. Healey disagree principally as to the timing and composition of gasoline products present on the Property, which bears directly on source attribution. Dr. O'Reilly opines that so-called "complex" gasoline—*i.e.*, gasoline containing additives such as alkylate—was present at the site as early as the mid-1950s, based on refinery development in Washington and changes in fuel production and distribution. Tr. 260, 263-264, 269-273, 294-295, 298-301. Mr. Healey, by contrast, opines that complex gasoline did not become prevalent until approximately the early 1980s and attributes such gasoline primarily to post-Exxon operations. Tr. 617, 631-632, 649-651, 654-655. This disagreement is material because it affects whether certain contamination signatures are more likely attributable to Exxon's pre-1982 operations or to later operators.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 17

The experts also disagree in their interpretation of chemical markers and the appropriate methodology for source attribution. Dr. O'Reilly relies on a multi-line-of-evidence approach, incorporating refinery history, distribution systems, and chemical indicators such as lead additives and EDC, to conclude that some contamination—including deeper impacts—is attributable to earlier releases associated with Exxon-era operations. Tr. 269; 272, 287-288. Mr. Healey, in contrast, applies greater weight on regulatory changes and later site operations, and he attributes complex gasoline contamination to more recent releases. Tr. 617, 619-622, 624-625, 644-645.

Finally, the experts diverge in their interpretation of the spatial distribution of contamination and the resulting conceptual site model. Dr. O'Reilly interprets the vertical and chemical stratification of contamination—including the presence of leaded gasoline markers at depth—as evidence of multiple historical releases, including releases predating 1982. Tr. 299-231, 294-295. Mr. Healey, by contrast, attributes greater significance to more recent releases and associated contamination patterns, including complex gasoline and LNAPL observed at the site, and he emphasizes more recent operational sources. Tr. 617, 624-625, 637-639. These competing interpretations reflect fundamentally different approaches to reconstructing the history of releases on the Property and inform the parties' respective positions on cost allocation.

### 2.     Dr. Mark Johns and Mr. Ryan Pozzuto

Plaintiff's expert Dr. Mark Johns and Exxon's expert Mr. Ryan Pozzuto both offered testimony bearing on the scope of remediation and the allocation of responsibility for contamination at the site, but they approached these issues from different perspectives and reached materially different conclusions. Both witnesses agree that petroleum contamination is present on the Property at depths exceeding 20 feet and that at least some portion of that deeper contamination is attributable to releases predating Plaintiff's ownership. Tr. 371-372, 554-557, 593-594. Both further

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 18

acknowledge that contamination at the site exceeds applicable MTCA cleanup levels and that additional remedial investigation is necessary to fully characterize the nature and extent of the contamination before a final remedy is selected. Tr. 360, 373-376, 560-562, 593-594.

The principal disagreement between these two expert witnesses concerns the scope of contamination that will require remediation and, correspondingly, the proper basis for allocating responsibility. Dr. Johns opines that allocation should be based on the relative volume of impacted soil, including both shallow and deep contamination, and concludes that approximately 82 percent of the contamination is attributable to Exxon. Tr. 384-386. His analysis assumes that contamination exceeding cleanup levels—including deeper contamination associated with earlier releases—will require remediation and therefore should be included in the allocation. Tr. 378-379 384-386. Dr. Johns further emphasizes that deeper contamination may be more significant and costly to address, reinforcing his inclusion of such contamination in his allocation framework. *Id.*

Mr. Pozzuto focuses on the scope of remediation likely to be required under site-specific conditions and regulatory practice. He testified that remedial efforts may reasonably be limited to targeted excavation of shallower soils, with deeper contamination addressed through groundwater treatment, monitoring, or natural attenuation depending on feasibility and risk considerations. Tr. 553-560, 568, 583, 594, 595. He further explained that full-depth excavation is often impracticable and not necessarily required under MTCA, and that remediation decisions are informed by engineering constraints and regulatory discretion. Tr. 558, 560-561, 583, 598-599. Finally, Mr. Pozzuto challenges the assumptions underlying Dr. Johns's allocation, particularly the inclusion of all impacted soils regardless of whether they will ultimately require remediation.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 19

These differences reflect competing approaches to translating contamination into remedial obligations and cost allocation, with Dr. Johns focusing on the extent of contamination and Mr. Pozzuto focusing on the scope of remediation likely to be required.

### F. Plaintiff's Past Remedial Action Costs

The parties agree that Plaintiff's past remedial action costs as of the date of trial total $332,632.61. Approximately 87 percent of those costs were incurred for services performed by Aspect and were paid by Colony. Tr. 135–136. The remaining costs were incurred for work performed by Plaintiff's expert, Exponent, and Plaintiff's counsel, Northwest Resource Law PLLC. Tr. 74.

Plaintiff contends that 82 percent of these costs are attributable to Exxon and seeks reimbursement in that amount. Any recovery obtained from Exxon will be repaid to Colony and applied toward the remaining policy limits to fund future remedial action costs. Tr. 78–79; Ex. P139 at 2.

### III.   ANALYSIS

### A. Plaintiff's Past Remedial Action Costs

The purpose of MTCA is to facilitate the cleanup of contaminated land and promote a healthy environment for future generations. *Seattle City Light v. Dep't of Transp.*, 98 Wn.App. 165, 169 (1999). Liability under MTCA is strict and joint and several, reflecting the statute's broad remedial purpose of ensuring that responsible parties bear the costs of environmental cleanup. *Iron Partners, LLC v. Maritime Admin.*, 2011 WL 4502139, *4 (W.D. Wash. Sept. 28, 2011); *see also Douglass v. Shamrock Paving, Inc.*, 189 Wn.2d 733, 740 ((2017) ("MTCA is 'to be liberally construed[.]'") (quoting RCW 70.105D.910).

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 20

A private party may bring an action to recover remedial action costs from any person liable under the statute. RCW 70A.305.080. To recover on a MTCA remediation claim, a plaintiff must establish that (1) it has incurred remedial action costs; (2) the defendant was liable for a release or threatened release of hazardous substances at the facility under RCW 70A.305.040; and (3) remedial action was taken to address the release of hazardous substances. *Seattle City Light*, 98 Wn.App. at 175. A private party may recover only those remedial action costs that are "substantially equivalent to a remedial action conducted or supervised by the department of ecology." RCW 70A.305.080; *see Taliesen Corp. v. Razore Land Co*., 135 Wn.App. 106, 120–23 (2006). If liability and recoverable costs are established, the court then must allocate responsibility among liable persons using such equitable factors as the court determines are appropriate. *Dash Point Village Associates v. Exxon Corporation*, 86 Wn.App. 596, 603 (1997). The prevailing party in a private MTCA action is entitled to recover reasonable attorney's fees and costs. RCW 70A.305.080.

Here, Exxon concedes that it is a liable person under RCW 70A.305.040, that hazardous substances were released on the Property, and that the work performed by Aspect on Plaintiff's behalf through the end of 2021 constitutes remedial action.[12] *See* Dkt. No. 63 at 26–27. The parties' agreement ends there, however. Exxon argues that the work performed by Aspect after 2021 does not meet MTCA's definition of "remedial action" and therefore is not recoverable. Exxon additionally maintains that, even if all of Aspect's work to date qualifies as remedial action, Plaintiff's cleanup efforts to date are not substantially equivalent to a remedial action conducted or

---

[12] While Exxon concedes that the work performed by Aspect through 2021 constitutes "remedial action" under MTCA, it contends that it bears no responsibility for those costs because the work was necessitated solely by the April 2020 release, for which Plaintiff is responsible. Exxon is correct that Aspect's initial investigation was prompted by the April 2020 leak. However, that framing is incomplete. By July 2021, Aspect's investigation had identified the presence of EDC on the Property, thereby expanding the scope and purpose of the remedial investigation. On this record, the Court cannot conclude that the work performed through 2021 was attributable exclusively to the April 2020 release.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 21

supervised by Ecology and, as such, the costs associated with that work is not recoverable. The Court addresses each of Exxon's arguments below.

### 1.    The post-2021 work performed by Aspect constitutes "remedial action" under MTCA

MTCA defines "remedial action" broadly to include "any action or expenditure consistent with the purposes of this chapter to identify, eliminate, or minimize any threat or potential threat posed by hazardous substances to human health or the environment including any investigative and monitoring activities with respect to any release or threatened release of a hazardous substance…[.]." RCW 70A.305.020(33); *see also*, *Douglass v. Shamrock Paving, Inc.*, 196 Wn.App. 849, 857 (2016), *reversed on other grounds*, 189 Wn.2d 733 (MTCA's definition of "remedial action" is "a broadly-worded provision"); *Bird-Johnson Corp. v. Dana Corp.*, 119 Wn.2d 423, 428 (1992) (MTCA is a remedial statute that courts interpret liberally to ensure that contaminated sites are investigated and cleaned up). The definition encompasses a wide range of activities, including investigation, monitoring, site evaluation, testing, cleanup, removal, and actions taken to prevent the migration of hazardous substances. Thus, Washington courts have consistently interpreted "remedial action" to include investigative activities undertaken to determine the nature and extent of contamination or to guide cleanup decisions. *Douglass*, 189 Wn.2d at 741 ("Based on the plain meaning of [MTCA], investigations of hazardous substances are remedial actions because their purpose is to 'discern whether such a threat exists.'") (quoting *Douglass*, 196 Wn.App. at 858).

Exxon argues that the work Aspect performed in 2022 and 2023 pursuant to the December 2021 RIWP Addendum does not constitute "remedial action" under MTCA because, in Exxon's view, that work was forensic in nature, undertaken not to identify, eliminate, or minimize threats

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 22

posed by contamination, but rather to determine who was responsible for the contamination. Exxon contends that once EDC was detected—raising the possibility that some contamination derived from historical releases predating Plaintiff's operations—the investigation shifted from characterizing contamination at the site to attempting to attribute responsibility to Exxon. In support of this argument, Exxon points to portions of Aspect's reports and to communications among Aspect, Plaintiff, and Plaintiff's counsel referencing forensic testing.

The Court concludes that the work performed by Aspect in 2022 and 2023 constitutes "remedial action" under MTCA. The activities performed during those years were a continuation of the investigation initiated in 2020 and 2021 and were directed at further characterizing the nature and extent of contamination on the Property. Each additional round of testing refined the understanding of the types of contaminants present, their distribution, and the potential risks they posed, thereby providing information necessary to evaluate appropriate cleanup measures. Investigative activities undertaken to determine the nature and extent of contamination fall squarely within MTCA's definition of remedial action. RCW 70A.305.020(33); *see also*, *Douglass*, 196 Wn.App. at 852, *reversed on other grounds*, 189 Wn.2d 733 ("By [MTCA's] plain terms, remedial action includes not only site cleanup but also investigation efforts undertaken to identify the need for cleanup."); *Dash Point*, 86 Wn.App. at 604-5 ("[O]ne component to remedial actions is site assessment and investigation to determine the extent of the problem.").

Exxon's contention that certain aspects of the investigation constituted "forensic testing" does not alter this conclusion. The label "forensic" does not necessarily mean that the work was performed solely for purposes of litigation. Rather, testing designed to determine the type, age, or source of contaminants may be an important component of site characterization because it helps inform the development of an appropriate remedial strategy and feasibility analysis. The fact that

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 23

such information may also bear on questions of responsibility for contamination does not transform otherwise legitimate investigative work into non-remedial activity. Accordingly, the Court finds that Aspect's investigative work in 2022 and 2023 qualifies as remedial action within the meaning of MTCA.

**2.    Plaintiff's remedial actions are substantially equivalent to the type of remedial action conducted or supervised by Ecology**

Having determined that all of Aspect's work performed to date constitutes "remedial action" under MTCA, the Court must next determine whether the investigation is the substantial equivalent of a remedial action conducted or supervised by Ecology. Under MTCA, "[r]ecovery of remedial action costs [is] limited to those remedial actions that, when evaluated as a whole, are the substantial equivalent of a department-conducted or department-supervised remedial action." RCW 70A.305.080; *Douglass*, 189 Wn.2d at 742. Whether a remedial action is substantially equivalent is a legal determination for the court. *Dash Point*, 86 Wn. App. at 603.

Ecology's regulations provide guidance as to what constitutes substantial equivalence and are intended to "facilitate private rights of action and minimize department staff involvement." WAC 173-340-545. Under these regulations, Ecology considers whether, among other things, (1) site information and remedial actions have been reported to Ecology; (2) Ecology has not objected, or any objections have been addressed; (3) appropriate public notice has been provided; (4) the work has been conducted in accordance with Ecology's technical standards; and (5) any hazardous substances have been properly handled and disposed of. *Taliesen*, 135 Wn. App. at 119 (citing WAC 173-340-545(2)(c)); *Seattle Times Co. v. LeatherCare, Inc.*, 337 F. Supp. 3d 999, 1052 (W.D. Wash. 2018) (same). Critically, however, the regulations make clear that these factors are to be evaluated "as a whole" and that a claim should not be disallowed due to omissions that do not

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 24

diminish the overall effectiveness of the remedial action. WAC 173-340-545(1). Thus, substantial equivalence does not require strict or perfect compliance with every regulatory requirement. *Taliesen*, 135 Wn. App. at 120-121.

Applying these principles, the Court concludes that the remedial investigation conducted to date is substantially equivalent to one that would have been conducted or supervised by Ecology. The evidence establishes that the 2020 release was promptly reported to Ecology and that Plaintiff retained Aspect to perform a site assessment in accordance with Ecology's requirements, which was submitted to Ecology on August 27, 2020. There is no evidence that Ecology objected to the work performed. The record further reflects that Aspect conducted its investigation in accordance with applicable technical standards, including systematic soil and groundwater sampling, installation of monitoring wells, and iterative refinement of the site conceptual model. Exxon itself concedes that Aspect's investigation was developed based on MTCA guidelines. In addition, the limited contaminated material removed to date was properly handled and documented.

Exxon argues that Plaintiff failed to comply with certain requirements of WAC 173-340-450 governing underground storage tank releases, including the timely removal and reporting of LNAPL. The Court agrees that Plaintiff did not strictly comply with these requirements. However, MTCA does not require strict adherence to every regulatory provision as a prerequisite to recovery. Rather, the inquiry is whether the remedial action, viewed in its entirety, is substantially equivalent to an Ecology-conducted cleanup. WAC 173-340-545(1).

*Taliesen Corp. v. Razore Land Co.* is instructive. There, the plaintiff failed to comply with several regulatory requirements, including timely reporting, evaluation of alternatives, and public notice, and employed an unnecessarily costly remediation method. 135 Wn. App. at 120–23. The Washington Appellate Court nevertheless rejected the argument that such deficiencies barred

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 25

recovery, holding that substantial equivalence turns on the overall effectiveness of the remedial action, not strict compliance with each regulatory requirement, and that Ecology's regulations provide guidance rather than rigid prerequisites to recovery. *Id*.; *see also*, *Louisianna-Pacific Corp. v. ASARCO Inc.*, 24 F.3d 1565, 1576 (9th Cir. 1994) (holding that compliance with the national contingency plan under CERCLA must be substantial, not perfect).

These principles apply with equal force here. Ecology's regulations impose specific requirements for the management of LNAPL because it represents a mobile, free-phase source of contamination that can migrate, impact groundwater, and pose heightened risks to human health and the environment. *See* WAC 173-340-450. While these characteristics justify prompt removal and active management, a failure to strictly comply with LNAPL-specific requirements does not, by itself, preclude a finding of substantial equivalence. Instead, such deficiencies must be considered in the context of the remedial action as a whole. On this record, Plaintiff's noncompliance does not undermine the overall effectiveness of the investigation to date or its ability to characterize site conditions. However, given the importance of LNAPL management under MTCA, these shortcomings may appropriately be considered in the equitable allocation of remedial action costs. *See Taliesen*, 135 Wn. App. at 140-141 (affirming trial court's determination that plaintiff's failure to comply with Ecology regulations did not render the cleanup substantially inequivalent to an Ecology cleanup, but plaintiff's failure was "egregious" and a tenable basis for allocating allowable cleanup costs to plaintiff).

Exxon further contends that the Court cannot determine substantial equivalence because the remedial investigation is incomplete, and no feasibility study or cleanup plan has yet been finalized. The Court disagrees. MTCA does not require completion of the entire cleanup before a party may recover remedial action costs. Rather, the statute expressly defines "remedial action" to include

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 26

investigative and monitoring activities, not just completed cleanup efforts. RCW 70A.305.020(33); *Douglass*, 196 Wn. App. at 852. In keeping with this definition, MTCA authorizes recovery of "remedial action costs" without conditioning recovery on the completion of all remedial phases. RCW 70A.305.080. Indeed, the Washington Supreme Court has confirmed that investigative costs incurred to determine the presence and extent of contamination qualify as recoverable remedial action costs, even where cleanup levels are not ultimately exceeded. *Douglass*, 189 Wn.2d at 739–41.

Consistent with this statutory framework, the absence of a completed feasibility study or final cleanup does not preclude the Court from evaluating substantial equivalence based on the work performed to date. *See Dash Point*, 86 Wn.App. at 603 (treating substantial equivalence as a legal determination for the court based on the record presented). Requiring completion of a feasibility study or final cleanup before permitting recovery would be inconsistent with MTCA's remedial purpose and would discourage prompt investigation and early response actions. Accordingly, the Court concludes that, when evaluated as a whole, Plaintiff's remedial investigation to date is substantially equivalent to a remedial investigation that would have been conducted or supervised by Ecology. Any remaining deficiencies are more appropriately addressed through the equitable allocation of costs.

### 3. Allocation of remedial investigation costs to date

Having determined that Plaintiff has incurred remedial investigation costs that qualify for recovery under MTCA, the Court must allocate those costs between Plaintiff and Exxon based on equitable factors. RCW 70A.305.080; *Douglass*, 196 Wn.App. at 855 ("Once a party establishes the right of recovery, the damage amount turns on equitable factors to be determined by the trial court."). MTCA vests the Court with broad discretion to allocate recoverable remedial action costs

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 27

based on equitable considerations, including the particular circumstances of the contamination and the remedial work performed. *See Seattle City Light*, 98 Wn.App. at 175 ("A liable party 'may be required to pay complete response costs, or may not be required to pay any response costs, or may be required to pay some intermediate amount' depending on the court's equitable assessment") (quoting *Akzo Coating, Inc. v. Aigner Corp.*, 909 F. Supp. 1154 (N.D. Ind. 1995)). The statute does not prescribe a particular method of apportionment, instead leaving allocation to the Court's equitable judgment based on the facts of the case. RCW 70A.305.080; *Douglass*, 189 Wn.2d at 741–42. This flexible, fact-driven inquiry is especially appropriate at the investigative stage of a remedial action, where the nature, extent, and sources of contamination have not yet been fully delineated and a causation-based apportionment is not presently feasible. *See, e.g., Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1187–88 (9th Cir. 2000) (the allocation of remedial costs under CERCLA is an equitable determination committed to the court's broad discretion and guided by the particular facts of the case, without any fixed formula).

Here, the record establishes that both Plaintiff and Exxon contributed to contamination on the Property and that their respective conduct gave rise to the need for the remedial investigation now underway. Although the April 2020 release prompted renewed investigation, the work performed has not been confined to that discrete event. Rather, the investigation has expanded to characterize both recent and historical contamination, including conditions predating Plaintiff's ownership. At this stage, the investigation remains focused on fundamental questions—namely, the nature and extent of contamination, the pathways of migration, and the relative contribution of potential sources. Until those questions are resolved, the Court cannot reliably segregate investigatory costs by source or assign those costs based on relative fault.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 28

In these circumstances, the equitable inquiry properly centers on who created the need for the investigation, not on a premature effort to parse ultimate responsibility. The record demonstrates that the investigation serves a shared purpose: it delineates contamination attributable to multiple sources and provides the technical foundation necessary for any eventual feasibility study and cleanup action. That certain investigative efforts may also inform questions of responsibility does not render them non-remedial; to the contrary, such work is integral to site characterization and remedy selection under MTCA. Accordingly, the benefits of the investigation—and the burdens associated with it—are appropriately shared between Plaintiff and Exxon.

Exxon's reliance on the incomplete status of the remedial investigation to resist allocation is unpersuasive. Washington courts have recognized that remedial investigation costs are recoverable under MTCA even where cleanup is ongoing. See *Dash Point*, 86 Wn.App. at 607–08. Indeed, such costs may be recoverable even where the investigation ultimately reveals that no further cleanup is required, so long as the defendant's conduct created the need for the investigation in the first instance. *See Douglass*, 196 Wn. App. at 859–60.

As stated above, the Court acknowledges that Plaintiff did not strictly comply with certain Ecology communications and LNAPL-specific regulatory requirements. While those deficiencies may bear on the parties' relative equities at a later stage—particularly if they are shown to have increased the scope or cost of remediation—they do not, on the present record, undermine the overall effectiveness of the investigation or justify shifting the share of investigatory costs from a 50/50 allocation between the parties. On this record, and given the early, investigative posture of the remedial action, the Court concludes that an equal allocation of the remedial investigation costs incurred to date is equitable. A 50/50 allocation reasonably reflects the parties' shared responsibility for creating the need for the investigation while recognizing that the current record does not permit

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 29

a more precise, fault-based apportionment. This allocation is limited to the investigatory phase and is without prejudice to revisiting the allocation of future costs as the evidentiary record develops, including as to the sources and extent of contamination and the parties' relative contributions thereto.

**B.    Plaintiff's Request for a Declaratory Judgment for Future Costs**

Plaintiff also seeks declaratory relief allocating responsibility for future remedial action costs associated with the contamination at the Property. Exxon does not dispute that it is a liable party under MTCA, and, as set forth above, the Court has concluded that Exxon is liable for remedial action costs incurred at the site to date. The Court therefore concludes that declaratory relief is appropriate as to Exxon's liability for future remedial action costs. The Court must determine, however, whether the present record permits an equitable allocation of those costs.

As has already been stated, an allocation determination is inherently fact-intensive and must be grounded in a sufficiently developed evidentiary record, including information concerning the nature and extent of contamination, the scope of remedial action required, and the relative contributions of each party. *See Seattle City Light*, 98 Wn.App. at 172 (noting that while the degree of the hazard for which a defendant is responsible is "irrelevant to liability" under MTCA, it is "relevant to the question of cost allocation").

On the present record, the Court concludes that allocation of future remedial action costs is premature. The scope of any future cleanup has not been determined: no feasibility study has been completed, no cleanup action plan has been developed, and Ecology has not been meaningfully engaged to provide direction regarding the required remedy. The absence of agency involvement is particularly significant given that remedy selection under MTCA is inherently a regulatory and site-specific determination. The record reflects that Plaintiff has not submitted the majority of its

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 30

remedial investigation materials to Ecology for review or comment, and the Court has not been presented with reliable evidence of what cleanup Ecology or PLIA may ultimately require. Without this information, the Court cannot reasonably allocate future cleanup costs between the parties. *See Seattle City Light*, 98 Wn. App. at 176 (declining to allocate cleanup cost to a liable party because the contamination it was responsible for did not present a risk to human health or the environment).

Declaratory relief is also limited by the incomplete state of the remedial investigation. The full extent of contamination has not yet been delineated, including the lateral and vertical boundaries of impacts and the potential for off-site migration. As a result, the Court cannot determine the full scope of contamination for which remedial action may be required or meaningfully assess the parties' relative contributions to that contamination. Allocation of future costs necessarily depends on an understanding of these factors, and where, as here, that information remains incomplete, any allocation would be subject to substantial revision.

The expert testimony underscores these uncertainties. Dr. Johns opined that allocation should be driven in part by the volume of impacted soil, including contamination at depth, and suggested that remediation to depths exceeding thirty feet may be required. However, he acknowledged that the work necessary to determine the actual extent of required cleanup has not yet been completed. By contrast, Mr. Pozzuto testified that remediation may reasonably be limited to shallower excavation, with deeper contamination addressed through groundwater treatment, monitoring, or natural attenuation depending on site-specific conditions, feasibility, and regulatory discretion. Both experts further agreed that natural attenuation may be an appropriate remedial approach under certain circumstances and that deeper excavation would require a cost-benefit analysis and may be constrained by the physical limitations of the Property.

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

 - 31

Additional uncertainty arises from the parties' competing expert opinions regarding the nature, timing, and source of contamination. Dr. O'Reilly and Mr. Healey offered materially different views as to when certain gasoline constituents were present at the site and how contamination should be attributed between different operational periods. These disputes bear directly on the parties' relative responsibility and further complicate any attempt to allocate future costs at this stage. The Court is also persuaded by Mr. Healey's testimony that allocation of future costs is premature given the ongoing operation of the site and the potential for future releases, including the presence of LNAPL and ethanol-related conditions that may contribute to continuing or future impacts.

In light of these uncertainties, the Court finds that the present record does not provide a sufficient factual basis to permit a reasoned and equitable allocation of future remedial action costs. Although Plaintiff has established a right to recover a portion of the past remedial investigation costs it as incurred to date, that determination does not permit the Court to allocate future costs where the nature and extent of the required remedy remain undefined. Under MTCA, the Court's obligation to allocate costs arises only after it can evaluate those costs on an equitable basis in light of a sufficiently developed factual record. RCW 70A.305.080; *Taliesen*, 135 Wn. App. at 123. In the absence of such a record, the Court cannot determine the universe of future costs to be incurred or equitably allocate responsibility for those costs among the parties. Any attempt to do so would necessarily rest on unresolved assumptions regarding the scope, method, and extent of cleanup, as well as the parties' relative responsibility for that cleanup, rendering such an allocation speculative and premature.

This approach is consistent with federal courts' treatment of analogous claims under CERCLA. Where liability has been established, courts may enter declaratory relief as to future

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 32

response costs and, where the evidentiary record permits, equitably allocate those costs among liable parties. *See Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1192 (9th Cir. 2000) (a claim for declaratory relief for contribution under CERCLA is ripe when "[t]he pollution has been carefully studied, the parties litigated a genuine controversy about millions of dollars they had already spent, and the facts bringing about their relative responsibility have already occurred"); *City of Colton v. Am. Promotional Events, Inc.-West*, 614 F.3d 998, 1007–08 (9th Cir. 2010) (denying declaratory relief on future liability where plaintiff failed to establish liability for past costs). Here, however, the present record—lacking a complete delineation of contamination and a defined remedy—does not provide a sufficient basis to perform a reasoned allocation, and the Court therefore defers that determination.

Accordingly, the Court will enter a declaratory judgment establishing Exxon's liability for future remedial action costs under MTCA; however, the Court declines to allocate responsibility for those costs at this time. Allocation is deferred pending further development of the record, including completion of the remedial investigation, engagement with Ecology, and determination of the scope of the required remedial action.

C.      **Attorneys' Fees and Costs**

Because Plaintiff has established Exxon's liability under MTCA and recovered a portion of its remedial action costs, it is the prevailing party within the meaning of RCW 70A.305.080 and is therefore entitled to recover its reasonable attorney's fees and costs, subject to appropriate adjustment to reflect the extent of its success. *Douglass*, 196 Wn.App. at 860.

//

//

//

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 33

## IV.   CONCLUSION

For the foregoing reasons, the Court HEREBY ORDERS as follows:

1.      Plaintiff's remedial action costs incurred to date are the type recoverable under MTCA;

2.      Those costs are allocated equally between Plaintiff and Exxon on a 50/50 basis;

3.      Exxon is liable for future remedial action costs incurred in compliance with MTCA to remediate petroleum contamination at the Property;

4.      Allocation of future remedial action costs is deferred pending further development of the record, including completion of the remedial investigation, preparation of a feasibility study, engagement with Ecology, and development of a cleanup action plan;

5.      Plaintiff is the prevailing party and is entitled to recover its reasonable attorney's fees and costs. Plaintiff shall file a fee petition, supported by appropriate documentation, within thirty (30) days of the date of this Order. The parties are encouraged to meet and confer in an effort to resolve any fee dispute. If no agreement is reached, Exxon may file a response within fifteen (15) days of the filing of the fee petition, and Plaintiff may file a reply within ten (10) days thereafter; and

6.      The Clerk of the Court is DIRECTED to enter judgment in favor of Plaintiff in the amount of $166,316.30. The Court retains jurisdiction to resolve Plaintiff's request for attorney's fees and costs and to amend the judgment as appropriate.

Dated this 31st day of March, 2026.

Barbara Jacobs Rothstein
U.S. District Court Judge

MEMORANDUM ORDER OF FINDINGS OF FACT AND CONCLUSIONS OF LAW

- 34